[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-15631

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 20, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 05-22728-CV-JEM

RAMON CERNUDA,

Plaintiff-Appellant,

versus

DONALD NEUFELD, Acting Director, Miami District Office,
United States Citizenship and Immigration Services,
UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES,
DEPARTMENT OF HOMELAND SECURITY,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 20, 2009)

Before BIRCH and MARCUS, Circuit Judges, and FORRESTER,* District Judge.

_____

*Honorable J. Owen Forrester, Senior United States District Judge for the Northern District of Georgia, sitting by designation.

PER CURIAM:

On December 17, 2005, Ramon Cernuda, filed suit against Donald Neufeld, Acting Director, Miami District Office, United States Citizenship and Immigration Services; the United States Citizenship and Immigration Services; and the United States Department of Homeland Security, seeking de novo review of a decision by the Citizenship and Immigration Services denying his application for naturalization based on his previous exemption from induction into military service in 1969.

Cernuda was born in Cuba on June 19, 1947. He entered the United States with his parents as a temporary visitor on October 6, 1960 when he was thirteen years old. On October 27, 1960, the Immigration and Naturalization Service approved an application to change Cernuda's visa status from temporary visitor to non-immigrant student. On July 23, 1965, when he was attending school in Puerto Rico, Cernuda registered with the Selective Service as he was required to do as an eighteen-year-old. On November 14, 1967, the Selective Service sent Cernuda an Order to Report for Induction. A year later, the Selective Service sent Cernuda another Order to Report for Induction. Then the Selective Service sent Cernuda two letters postponing his induction date to February 10, 1969, and May 31, 1969. Finally, the local registration board sent Cernuda a letter informing him that his

2

admission for active duty had been scheduled for June 25, 1969, and directing him to report to the Admission Station at Fort Brooke in San Juan on that date.

Two days prior to that date, on June 23, 1969, Cernuda filed an "Application by Alien for Relief from Training and Service in the Armed Forces" Form SSS-130 with his local Selective Service office.  DE66, Exh. D.  A notation at the bottom of the form indicated that it was last revised on "9-1-51."  Id.  At the bottom of the application, there was a notice regarding Section 4(a) of Title I of the Universal Military Training and Service Act, as amended, which advised in italic print that any alien who applies for relief from liability for training and service under the Act "shall thereafter be debarred from becoming a citizen of the United States."  Id.  Just above the signature line for the form there was a paragraph which stated:

> I hereby apply for relief from liability for training and service in the Armed Forces of the United States.  I have read the **NOTICE** given below, and I understand that I will forever lose my right to become a citizen of the United States, and that I may also be prohibited from entry into the United States or its territories or possessions as a result of filing this application.

Id.

Cernuda testified that he signed the form because although he was willing to fight for the liberation of Cuba, he would not serve in Vietnam.  Upon the recommendation of the local Selective Service official, Cernuda also wrote a letter

3

to President Nixon explaining his unwillingness to serve in Vietnam because of his political beliefs. In that letter, he stated he wanted to lodge a "firm protest against the compulsory recruitment policy that the Selective Service of your country is imposing on the young Cubans that up to this date maintain the condition of politically exiled . . . ." DE66, Exh. C. He went on to state that although Cuban exiles had believed that the United States was their ally, the United States had changed its policy toward the Castro regime to a "painful rhythm of coexistence" and assimilation of exiles. Id. He concluded by informing President Nixon that he could not give up his condition of "active combatant to achieve a New Cuba" and thus he refused service. Id.

The Selective Service accepted Cernuda's form and changed his status on August 15, 1969, to Class IV-C, a classification the Selective Service describes as for "aliens not currently liable for military service." DE66, Exh. L (Cernuda's Classification Record); DE60, Exh. J (Selective Service form). The next column in the Selective Service's records shows that at some point, Cernuda was also classified as 1-H, DE66, Exh. L, which designates "[r]egistrant not currently subject to processing for induction." DE60, Exh. X (citing 36 Fed. Reg. 23376 (1971)). There is a scratched out date in this column which appears to be "11-1-72." DE66, Exh. L. The final column of Cernuda's record again lists "4-C" with

4

no date. Id.  The Selective Service never sent Cernuda another notice of induction after he filled out Form SSS-130.

Cernuda was informed on two other occasions that the fact he signed a Form SSS-130 would bar his path to citizenship.  On March 26, 1973, Cernuda applied for permanent residence in the United States under section 1 of the Cuban Adjustment Act, 8 U.S.C. § 1255.  The Immigration and Naturalization Service denied Cernuda's application pursuant to section 212(a)(22) of the Immigration and Nationality Act, codified at 8 U.S.C. § 11182, which permanently bars anyone who has requested and received an exemption from military service on the ground of alienage from applying for permanent residency.

Next, on November 5, 1984, Cernuda applied for relief under section 1 of the Cuban Adjustment Act, which, having been amended, now authorized the Immigration and Naturalization Service to grant certain waivers of excludability to aliens who might otherwise be inadmissible, including Cubans who were paroled into the United States prior to April 1, 1980.  The local office of the Immigration and Naturalization Service granted Cernuda's application for a waiver on May 29, 1985, and awarded Cernuda permanent residence status, but the notification to Cernuda indicated that he would still be debarred from applying for citizenship.

5

Notwithstanding, Cernuda applied for naturalization on May 16, 2000 with Form N-400. Immigration and Naturalization Services issued a decision on September 21, 2001, denying Cernuda's application because he had applied for and received an exemption for military service based on his alienage. At Cernuda's request, Citizenship and Immigration Services, the successor agency to Immigration and Naturalization Services, held a hearing on July 27, 2004. It issued another decision on June 22, 2005, affirming its denial stating that Cernuda had failed to show by clear and convincing evidence that his request for an exemption from military service was not based upon alienage as required by 8 C.F.R. § 315.2(a). Cernuda filed the instant action on October 17, 2005, pursuant to 8 U.S.C. § 1421(a), which provides that an individual who has been denied naturalization can apply to the federal district court for de novo review.

During discovery, Cernuda requested, and the district court ordered over the objection of the Government, that Citizenship and Immigration Services produce the names and files of more than 195 aliens who had requested an exemption from military service but were later naturalized. Cernuda had an expert review those files, and his conclusions form a portion of Cernuda's arguments with respect to his Equal Protection and Administrative Procedure Act claims. The district court denied Cernuda's motion to file a third amended complaint. In a separate order,

6

the court granted Defendants' motion for summary judgment finding that under the Immigration and Nationality Act § 315(a), codified at 8 U.S.C. § 1426(a), providing that "any alien . . . [who] has applied for exemption . . . from training or service in the Armed Forces . . . of the United States on the ground that he is an alien," Cernuda's application for naturalization was barred.

We review the district court's grant of a motion for summary judgment de novo applying the same standards that governed the district court's opinion. Johnson v. Booker T. Washington Broadcasting Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000). We review the district court's denial of leave to amend a complaint for an abuse of discretion. Bel-Bel Int'l Corp. v. Cmty. Bank of Homestead, 162 F.3d 1101, 1110 (11th Cir. 1998).[1]

Cernuda raises a number of issues on appeal – whether: (1) the Universal Military Training and Service Act ("UMTSA"), 50 U.S.C. App. §§ 451, *et seq*. (1948), applied to Cernuda in 1969; (2) international law bars the conscription of

[1]On May 31, 2007, the district court denied Cernuda's motion to file a third amended complaint. Cernuda's motion sought leave to add an additional Count X to his complaint, alleging that (1) the Form SSS-130 that Cernuda signed on June 23, 1969, was obsolete because it was the 1951 version instead of the January 8, 1969 version, and (2) Cernuda was never administered an oral oath by an individual named Leopoldo Castro, as purported on the Form SSS-130. The district court denied Cernuda's motion on the basis of undue delay and unfair prejudice to Defendants. The court noted prejudice to Defendants in having to attempt to locate records thirty years old and attempt to subpoena a witness beyond the subpoena power of the court. Particularly in light of the fact that the district court considered these arguments in conjunction with Defendants' motion for summary judgment, we find no abuse of discretion in the district court's order denying Cernuda's motion to file a third amended complaint.

parolees/refugees; (3) UMTSA's alienage exemption applies to him considering the Form SSS-130 he signed had been superseded by a new version, he did not sign the form with informed consent, and he did not obtain the benefit of the bargain of signing the form; (4) President Carter's pardon pursuant to Executive Order No. 11967 (Jan. 21, 1977) applies to Cernuda; (5) the waiver granted to Cernuda in 1984 with respect to his naturalization should also apply to his citizenship application; and (6) the Government's granting of citizenship to other applicants in Cernuda's position violated his rights under the Equal Protection Clause. Only a few of these merit discussion.[2]

Cernuda argues that his Form SSS-130 was not valid because it was signed on an outdated form, no one explained the consequences of the form, and he did not receive the benefit of his bargain. There is no dispute that the form Cernuda signed on June 23, 1969, was outdated. It had been printed on September 1, 1951

---

[2]For the reasons given in the district court's thorough opinion we reject Cernuda's arguments as to whether: (1) the Universal Military Training and Service Act, 50 U.S.C. App. §§ 451, *et seq*., applied to Cernuda in 1969; (2) international law bars the conscription of parolees/refugees; (4) President Carter's pardon pursuant to Executive Order No. 11967 (Jan. 21, 1977) applies to Cernuda; and (5) the waiver granted to Cernuda in 1984 with respect to his naturalization should also apply to his citizenship application.

Cernuda also challenges the district court's denial of a hearing pursuant to 8 U.S.C. § 1421(c) which provides that judicial review "shall be de novo, and the court shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing de novo on the application." Id. While we have not yet addressed this issue, in Chan v. Gantner, 464 F.3d 289 (2d Cir. 2006), the Second Circuit found that the mandatory language in § 1421(c) did not apply where the standards for summary judgment would be met. Id. at 295-96.

and was current through January 8, 1969, when the Selective Service revised the form. A new form was available at the time Cernuda filed his application for exemption.

We find, however, that the new form did not differ from the old form in any material way. The revised form contained the same notice at the bottom concerning debarment as the old form. The revised notice did now specifically reference an additional statutory bar to citizenship – 8 U.S.C. § 1426. The paragraph above the signature line also slightly differed by specifying the applicant understood he was applying for relief "on the ground that I am an alien." DE66, Exh. E. The 1951 form advised prospective applicants that they would be debarred from ever applying for admission as permanent residents "under other existing law" while the newer version specified that the existing law was sections 315 and 212(a)(22) of the Immigration and Nationality Act. DE66, Exh. D. While the 1951 form did not specifically state, "I hereby apply for relief from liability for training and service in the Armed Forces on the ground that I am an alien," as the new form did, it still contained the acknowledgment that the applicant had read the notice and understood the bar to permanent residence or citizenship. DE66, Exh. E. Cernuda cannot show any prejudice in having signed the old form because – while not identical in language – it contained the same warnings with respect to

9

future citizenship as the old form. Both forms contain the notice that the applicant would be barred from future citizenship.

Cernuda points to no case – and we have located none – which supports his argument that a waiver signed on an outdated form is invalid and should have no civil consequences. United States v. Medina Orta, 305 F. Supp. 1073 (D. P.R. 1969), was a criminal case where the obsolete form and current form differed in substantial and material ways because the old form did not put the registrant on notice of the possible penalties he faced in failing to report for a physical examination before the local board of Selective Service. In that case, the court granted the defendant's motion for judgment of acquittal. Id. at 1076. In both Daniels v. Marshall, Civil Action No. 1:02-CV-5880-AWI-SMS-P, 2006 WL 1222973 (E.D. Cal. May 5, 2006), and Spurgin v. C.I.R., No. 11196-00, 2001 WL 1347234 (T.C. Nov. 2, 2001), the administrative agency refused to accept an application completed on an outdated form. Here, the Selective Service Board accepted Cernuda's application for an exemption and, as discussed below, granted him the benefits of that exemption.

Moser v. United States, 341 U.S. 41 (1951), relied on by Cernuda, is clearly distinguishable. There, the Supreme Court held that a Swiss national who had applied for an exemption from military service during World War II was not

debarred from citizenship because of the misleading circumstances of his case. Id. at 41. Moser had been specifically instructed by the Swiss Legation in the United States that his application for exemption would not bar him from American citizenship in the future. Id. at 44. Furthermore, Switzerland and the United States had signed a treaty which dealt specifically with the issue of Swiss aliens in the United States and their eligibility for service, and the significance of this treaty impacted the court's analysis. Id. at 45-46. Unlike Moser, Cernuda has not identified any Government representative who informed him that he would still be eligible for citizenship even if he signed the form.

Finally, Cernuda argues that he did not receive the benefit of his bargain in signing Form SSS-130 because he, in fact, became eligible for the draft based on a notation made in his Selective Service file. We are unpersuaded. Although a notation does appear in Cernuda's file showing a change to 1-H status on November 1, 1972, it is undisputed that the only notification Cernuda received from Selective Service was that his status had changed to IV-C upon his submission of Form SSS-130. In fact, his file shows a return to the 4-C status after an uncertain period of 1-H. Cernuda never received an order to report for induction, the Government never attempted to induct him, and Cernuda never received notification that his status with the Selective Service had changed. This

11

distinguishes Cernuda from the registrant in <u>Astrup v. INS</u>, 402 U.S. 509 (1971), a case upon which he relies. Astrup's release from service was only temporary, and the United States attempted to induct him into service after he had signed the Form SSS-130.[3]

Cernuda next argues that the decision of Citizenship and Immigration Services violates the Administrative Procedure Act, 5 U.S.C. §§ 702 *et seq.*, because it was arbitrary and capricious. In a similar vein, he contends that the decision violates the Equal Protection Clause because several other individuals in Cernuda's position who had applied for an exemption were eventually granted citizenship.

Section 706(2)(A) of the Administrative Procedure Act allows the court to hold agency actions unlawful and set them aside where they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). As we have found above, however, the decision to deny

---

[3]Cernuda takes a pass at arguing that he did not apply for the exemption based on the fact of his alienage, but rather on the basis of his political beliefs as evidenced by his letter to President Richard Nixon explaining his request for an exemption. As the Government pointed out, however, the Selective Service law did not provide for an exemption on the basis of political belief. The Military Selective Service Act, 50 U.S.C. App. § 456(j), provided that registrants could seek relief from military service on the grounds of conscientious objection, but this objector status was available only to those who opposed the idea of war in any form. Cernuda clearly did not, as he asserted he wanted to fight for the liberation of Cuba. <u>See</u> § 456(j) (noting that "'religious training and belief' does not include essentially political, sociological, or philosophical views, or merely a personal moral code").

Cernuda's application for naturalization was not improper; thus, it could not be arbitrary and capricious.

Based on the information Cernuda obtained in discovery, Cernuda argues that there were nine cases of Cuban applicants who had requested exemption from military service but had been naturalized; four others had invoked President Carter's 1977 pardon and later received naturalization; and fourteen more who had been granted a waiver for permanent residence under 8 U.S.C. § 1182(a)(22) Cuban Adjustment Act provisions, and also were subsequently naturalized.

In his equal protection claim, Cernuda does not offer any basis upon which he believes Citizenship and Immigration Services discriminated against him. At best, Cernuda is arguing a "class of one" equal protection violation. See Village of Willowbrook v. Olech, 528 U.S. 562 (2000) (per curiam) (plaintiffs state equal protection claim where they allege they were intentionally treated differently from other similarly-situated individuals without any rational basis). In Young Apartments, Inc v. Town of Jupiter, 529 F.3d 1027 (11th Cir. 2008), the Eleventh Circuit stated that in order to prove class of one equal protection claim, plaintiffs must show "(1) that they were treated differently from other similarly situated individuals, and (2) that Defendant unequally applied a facially neutral ordinance for the purpose of discriminating against Plaintiffs." Id. at 1045 (quotation and

citation omitted).  See also Griffin Industries, Inc. v. Irvin, 496 F.3d 1189, 1203 (11th Cir 2007) ("Governmental decisionmaking challenged under a 'class of one' equal protection theory must be evaluated in light of the full variety of factors that an objectively reasonable governmental decisionmaker would have found relevant in making the challenged decision.").

Here, Cernuda can potentially show that he was treated differently than similarly-situated individuals, but he cannot show that Citizenship and Immigration Services unequally applied a facially neutral ordinance for the purpose of discriminating against him.  The individuals cited by Cernuda were evaluated by immigration offices across the country.  The fact that administrators in certain areas may have made errors in the application of the regulations does not mean that the correct evaluation made in Cernuda's case violates the Equal Protection Clause.  See, e.g., Seven Star, Inc. v. United States, 873 F.2d 225, 227 (9th Cir. 1989) ("claim that an administrative agency has made different decisions in different cases, in different years, does not give rise to a claim for relief on equal protection grounds"; "equal protection principles should not provide any basis for holding that an erroneous application of the law in an earlier case must be repeated in a later one"; and "a decision by an administrative agency in one case does not mandate the same result in every similar case in succeeding years");

E & T Realty v. Strickland, 830 F.2d 1107, 1114 (11th Cir. 1987) ("[m]ere error or mistake in judgment when applying a facially neutral statute does not violate the equal protection clause. There must be intentional discrimination"; "[e]ven arbitrary administration of a statute, without purposeful discrimination, does not violate the equal protection clause") (internal quotations and citations omitted). At most, the individual cases cited by Cernuda show some inconsistency across local offices of Citizenship and Immigration Services and its predecessor agency, Immigration and Naturalization Services. However, mere inconsistency does not state a constitutional violation.

The bottom line is Cernuda applied for and was granted the benefits of an exemption from selective service based on his status as a Cuban alien. Other interactions Cernuda had with immigration officials confirmed that while he could be a permanent resident of the United States, he would never be eligible for naturalization. Cernuda cannot now overturn the consequences of his decision to seek exemption from selective service, and therefore, we AFFIRM the decision of the district court.